226 N.J. Super. 532 (1988)
545 A.2d 192
EMANUEL TERNER, JOHN DOE AND RICHARD ROE, PLAINTIFFS-APPELLANTS,
v.
SPYCO, INC., THE PLANNING BOARD OF THE TOWNSHIP OF OCEAN AND THE TOWNSHIP COUNCIL OF THE TOWNSHIP OF OCEAN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 1988.
Decided July 20, 1988.
*535 Before Judges DEIGHAN and LANDAU.
William S. O'Hagan argued the cause for appellants (Stout & O'Hagan, attorneys; Scott R. Baron, on the brief).
Philip W. Crawford argued the cause for respondent Spyco, Inc. (Crummy, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Philip W. Crawford, on the brief).
Michael J. Gross argued the cause for respondent Planning Board of Ocean Township (Kenney & Kenney, attorneys; Frank M. McDonough, on the brief).
The opinion of the court was delivered by LANDAU, J.A.D.
Plaintiffs Emanuel Terner, John Doe and Richard Roe (collectively Terner) appeal from the trial judge's dismissal of their complaint in lieu of prerogative writ wherein they challenge defendant Planning Board of the Township of Ocean's preliminary approval of an application for a major subdivision by defendant Spyco, Inc. (Spyco). The critical issue on appeal is whether the Planning Board correctly interpreted an Ocean Township Zoning Ordinance prohibiting erection of buildings or structures within a designated 100 year flood plain.
In October 1985, Spyco applied to the Planning Board for preliminary major subdivision approval to subdivide property designated as Block 218.1, Lots 2B, 2C, 2D and 2E on the Tax *536 Map of the Township of Ocean. The site has an area of 35.26 acres and is divided between two zoning districts with 14.67 acres located in 0-2 Office, Research, Professional Zone and the remaining 20.59 acres located in R-3, Medium Density Single Family Residential Zone. Spyco proposed to subdivide the property with the 14.67 acres located in 0-2 zone constituting one lot. Initially, Spyco sought subdivision of the remaining 20.59 acres into more than 32 lots which would have required a variance from the lot dimensional requirements of the R-3 zone, but it modified its proposal to constitute only 32 lots at the request of the Board in order to conform with the "cluster design" requirements of the R-3 zone.
Hearings on Spyco's application were conducted by the Planning Board commencing on November 11, 1985 and concluding on June 23, 1986. Terner, who owns land situated within 200 feet of the subject premises, and other community persons appeared at the hearings to object to Spyco's application based, among other things, upon drainage and environmental concerns and what Terner alleged to be construction of residences within a designated 100 year flood plain in violation of § 21-9.28 of the Ocean Township Zoning Ordinance. This ordinance provides that:
Flood Plains. No building or structure shall be erected within the designated 100 year flood plain as defined on the Township's Insurance Rate Map, prepared by the U.S. Department of Housing and Urban Development, Federal Insurance Administration, dated October 1977, as amended, or as defined in the Township of Ocean Drainage Master Plan, prepared by Schoor Engineering, Inc., dated December 1976, copies of which are on file in the Office of the Township Engineer at the municipal building. In the event of a conflict between the two flood plain delineations, the more restrictive will apply.
After a very comprehensive review entailing 12 hearings, 11 of which were public, which included testimony and reports by at least 12 experts, the Planning Board on June 23, 1986 voted to grant Spyco preliminary major subdivision approval subject to certain conditions including "[r]eceipt of all required governmental approvals, if any." The Board found that no housing units were to be constructed within a 100 year flood plain or in *537 the alternative, that even if some residences were to be built within a 100 year flood plain, that:
adequate proofs have been presented to satisfy this Board that the extraordinary condition of this particular piece of property justifies the grant of this variance and that also the benefits of granting this variance greatly outweigh any minor detriment which might result from such grant. In addition, the Board specifically finds that there will be no adverse impact upon the zone plan ... If anything, the existing conditions would be improved.
Terner initiated an action in lieu of prerogative writ and the trial judge affirmed the Planning Board decision saying that the proposed construction was not within the "designated 100 year flood plain as defined by the Township's Insurance Rate Map." The trial judge did not reach the issue of whether, if required, the Planning Board's grant of a variance was justified but observed only that the Planning Board "properly found there was no need for a variance."
Terner raises four points on appeal:
I. DEFENDANT OCEAN TOWNSHIP PLANNING BOARD MAY NOT CIRCUMVENT THE PROVISIONS OF THE OCEAN TOWNSHIP ZONING ORDINANCE.
II. THE UNCONTROVERTED FACTS OF THIS CASE REQUIRE THE APPELLATE DIVISION TO REVERSE THE TRIAL COURT.
III. DEFENDANT PLANNING BOARD, LACKED JURISDICTION TO HEAR DEFENDANT SPYCO'S SUBDIVISION APPLICATION.
IV. PLAINTIFF WAS PRECLUDED FROM PRESENTING TESTIMONY REGARDING ENVIRONMENTAL PROBLEMS AND CONCERNS TO THE DETRIMENT OF THE CITIZENRY AND SURROUNDING AREA BY THE DEFENDANT PLANNING BOARD.
We have considered carefully the briefs and arguments of counsel as well as the Planning Board's resolution and trial judge's written opinion and we conclude that Spyco's subdivision proposal clearly contemplates that at least some residences will be constructed in what the Ocean Township Zoning Ordinance, § 21-9.28 (the Ordinance) has designated as a 100 year flood plain wherein no buildings or structures are to be erected.
The Ordinance provides that the designated 100 year flood plain is to be determined either by the Township's Insurance Rate Map or as defined in the Township of Ocean Drainage *538 Master Plan, prepared by Schoor Engineering, Inc. (the Schoor Report), whichever is more restrictive. It appears undisputed that no construction will occur within the 100 year flood plain as defined by the Township's Insurance Rate Map. Question was raised, however, whether construction will occur within the 100 year flood plain as defined by the Schoor Report. The dispute arises from use in the Schoor Report of the term "floodway" on its map plates, without reference to "flood plain." At the Planning Board hearings, one of Terner's expert witnesses presented a translucent overlay of land lying within the "floodway" as illustrated in the Schoor Report plates and showed that when placed over a map of the proposed subdivision, four residences would be located over a natural drainage ditch and that an additional four homes lay within the designated boundaries of the floodway. This expert noted that the Schoor Report used only the term "floodway" on its plates and that as the Schoor Report defined it, the areas designated as "floodways" were within the 100 year flood plain. Neither Spyco nor the Planning Board refute that eight residences will be located within a "floodway" as depicted in the Schoor Report. The Planning Board, however, approached the issue of whether the Schoor Report's floodway was also within the 100 year flood plain as a factual question and after hearing extensive testimony on the issue of whether the subject area was or was not within a 100 year flood plain, it concluded that "there are no housing units to be constructed within any 100 year flood area." We think the Planning Board erred by treating this as an open factual question, subject to the opinions of various experts. In so doing, it ignored the express purpose of the Ocean Township Zoning Ordinance which was to apply the most restrictive of the two designations of flood plain (The Insurance Map and the Schoor Report) incorporated by reference into its Zoning Ordinance.
Generally, scope of review of administrative decisions is to determine whether findings could reasonably have been reached on sufficient credible evidence in the record as a whole. *539 Davis Enterprises v. Karpf, 105 N.J. 476, 485 (1987). Interpretation of a zoning ordinance, however, involves a question of law and a court is not bound by a planning board's interpretation. Mayflower Securities Co. v. Bureau of Securities, 64 N.J. 85, 93 (1973); Supermarkets Oil v. Zollinger, 126 N.J. Super. 505, 507 (App.Div. 1974); Trenkamp v. Township of Burlington, 170 N.J. Super. 251, 267 (Law Div. 1979).
The purpose of the court in construing ordinances, like statutes, is to determine the legislative intent. L & L Clinics, Inc. v. Irvington, 189 N.J. Super. 332, 336 (App.Div. 1983). Construction of the Ordinance at issue here is complicated somewhat because the municipality has incorporated by reference two reports into its Ordinance and the dispute focuses on terms used within one of these reports. Notwithstanding this complication, zoning ordinances are to be liberally construed in favor of the municipality. Place v. Bd. of Adjust. of Saddle River, 42 N.J. 324, 328 (1964). Here, the express intent of the Ocean Township governing body is that when faced with two conflicting definitions of flood plain, the more restrictive definition is to apply. It is this legislative directive which must govern as we consider whether Spyco's subdivision proposal will result in construction within a 100 year flood plain.
As we observed in an earlier case, words of a statute or ordinance cannot be considered to exist in a vacuum without reference to relevant policies. In re Boardwalk Regency Casino License Application, 180 N.J. Super. 324 (App.Div. 1981), mod. on other grounds 90 N.J. 361 (1982), app. dism. 459 U.S. 1081, 103 S.Ct. 562, 74 L.Ed.2d 927 (1982). In 1962, New Jersey implemented its Flood Hazard Area Control Act, N.J.S.A. 58:16A-50 et seq. which authorizes the Department of Environmental Protection (DEP), to adopt land use regulations for areas designated as flood hazard areas. The act provides that municipalities may adopt more restrictive requirements than DEP rules for areas designated as floodways and it contains definitions of various terms including "flood plain" and "floodway." When the Schoor Report was submitted in 1976, the act *540 defined a flood plain as "the relatively flat area adjoining the channel of a natural stream, which has been or may be hereafter covered by flood water." A floodway was defined as "the channel of a natural stream and portions of the flood plain adjoining the channel, which are reasonably required to carry and discharge the flood water or flood flow of any natural stream." L. 1972, c. 185. Flood plain is the broader term. It encompasses all the land that might at some point be inundated by flood waters while floodway encompasses the channel and a portion of the broader flood plain area. See also, N.J.A.C. 7:13-1.1; 5 Williams, American Land Planning Law, § 158.24 at 463, n. 26 (1985) ("[F]loodway includes the normal stream channel, plus that part of the flood plain which is flooded.... Floodplain is ... larger area which may be flooded during an extraordinary and rare flood ..."); and Moskowitz and Lindbloom, The Illustrated Book of Development Definitions, at 89-91 (1981), in which the following definitions appear:

Flood Fringe Area  That portion of the flood hazard area outside of the floodway based on the total area inundated during the regulatory base flood plus twenty-five percent of the regulatory base flood discharge.

Flood Hazard Area  The flood plain consisting of the floodway and the flood fringe area.

Flood Plain  The channel and the relatively flat area adjoining the channel of a natural stream or river which has been or may be covered by floodwater.

Floodway  The channel of a natural stream or river and portions of the flood plain adjoining the channel, which are reasonably required to carry and discharge the floodwater or flood flow of any natural stream or river.
Consequently, when the Schoor Report mapped an area as being within a "floodway," that area necessarily fell within the 100 year flood plain because by definition a floodway is a portion of the flood plain. Putting it another way, there is no definition of the term floodway which would be broader than the term flood plain.
Despite the voluminous testimony presented below, Spyco does not deny that the technical meaning of floodway encompasses a portion of the flood plain nor does it appear that any testimony was introduced suggesting that the author of the *541 Schoor Report intended to express something other than this technical meaning. In the absence of any contrary testimony, we must conclude that by its use of "floodway," the Schoor Report intended its usual technical meaning and that in accordance with this definition of floodway, areas designated on Schoor's map as floodway areas would also be contained within the 100 year flood plain. See Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 150 (App.Div. 1960) (technical terms and words of art should be given technical meaning, unless context indicates otherwise) certif. den. 34 N.J. 66 (1961); Josefowicz v. Porter, 32 N.J. Super. 585, 590 (App.Div. 1954) (same).
Moreover, as one of Terner's expert witnesses noted in reviewing the Schoor Report, "if you say there is no flood plain [on the subject site], then there is no flood plain anywhere in the township, because he doesn't use it [flood plain] on any of his plates." If the Schoor Report's failure to use the term "flood plain" on its map plates is interpreted to mean that it does not designate any flood plain areas in its entire report, then the Schoor Report would become a nullity insofar as the Ordinance is concerned. A cardinal rule of statutory construction is that construction that will render part of a statute meaningless or useless is to be avoided. County of Monmouth v. Wissell, 68 N.J. 35, 42 (1975); State v. Canola, 135 N.J. Super. 224 (App.Div. 1975), mod. on other grounds, 73 N.J. 206 (1977). See also Cabarle v. Governing Body of Pemberton Tp., 167 N.J. Super. 129 (Law Div. 1979), aff'd 171 N.J. Super. 586 (App.Div. 1980) (if reasonably possible, court should seek significance in legislative language rather than to conclude for sterility therein).
Spyco further argues that the Schoor Report is a generalized study and that it requires site specific analysis to determine whether a particular area is within a flood plain. To support this argument, Spyco points to language in the Schoor Report to the effect that it "covers the Township in broad *542 terms and not lot by lot ..." This quote is taken out of context and does not refer to the nature of the analysis used by Schoor for the major drainage basins, including the one contained on the subject site. Rather, it refers to a previous sentence describing the scope of the report and stating that the report does not cover "relatively minor water courses ... nor ... investigate individual inlets...."
Obviously, as is clearly reflected in the testimony below, there can be differing views on whether a given area lies within a flood plain. Here, however, the Ordinance states that the 100 year flood plain is defined by either of two reports, whichever is more restrictive. Neither we nor the Planning Board may substitute our judgment for that of the legislated Ordinance.
Spyco's proposed subdivision development is in violation of the Ordinance prohibiting construction within the 100 year flood plain.
Terner urges that because a portion of the proposed subdivision was within the flood plain, Spyco should have applied for a use variance pursuant to N.J.S.A. 40:55D-70(d) which grants to the Municipal Board of Adjustment the exclusive power to issue variances allowing "a use or principal structure in a district restricted against such use or principal structure...." Id. Spyco responds that if a variance is required, it would not be a "use" or "d" variance because the property is located within an R-3 zone which is dedicated exclusively for residential use and that the proposed application contemplates only residential development. Instead, Spyco submits that a "c" or "hardship" variance, N.J.S.A. 40:55D-70(c)(1)[1] is needed and that the Planning *543 Board has ancillary jurisdiction to grant subsection c variances when the proposed development also requires subdivision approval as it did in this case. N.J.S.A. 40:55D-60.
As a preliminary matter, we note that 100 year flood plain control provisions are primarily designed to avoid injuries to persons occupying the property or to the property itself during such a flood and in some instances, injuries to persons or property in the area downstream from the improper development. N.J.A.C. 7:12-1.1; Usdin v. Environmental Protection Dep't of N.J., 173 N.J. Super. 311, 331 (Law Div. 1980), aff'd 179 N.J. Super. 113 (App.Div. 1981). Thus, occupants' public safety and the safety of adjacent and downstream property may be directly affected by the improper grant of a variance from flood plain restrictions, much more so than in the typical request for a "c" or "d" variance. This threat to safety should weigh strongly against variances from a municipality's flood related ordinances which should rarely be granted, even if made subject to other governmental approvals.
We do not think that the question of whether a subsection c or subsection d variance is required (the former being properly granted by the Planning Board and the latter only by the Board of Adjustment) can be disposed of as easily as either Terner or Spyco suggest.
There is a respectable basis for Terner's argument that Spyco should have applied for a use or "d" variance in order to construct residences within the 100 year flood plain. The Ocean Township Zoning Ordinance prohibits erection of any building or structure within a 100 year flood plain and it goes on to define the flood plain in accordance with the Township's Insurance Rate Map or the Township of Ocean Drainage Master Plan (Schoor Report), whichever is more restrictive. We *544 have held that under the Schoor Report, eight of the proposed residences would fall within the 100 year flood plain in which the Zoning Ordinance prohibits erection of any building or structure. It is true that insofar as the overall zoning of the town is concerned, this district has been designated R-3 and appropriate for residential structures. However, with its flood plain ordinance, Ocean Township has adopted what is referred to as an "overlay" district, that is, it has left in place the districts adopted in its Zoning Ordinance but added a new layer of controls when the land is located within a 100 year flood plain. See, Rathkopf, The Law of Zoning and Planning, § 7.03 at 7-17 (4th Ed.). Under the "overlay" zoning, no building or structure, regardless of whether it is residential, can be constructed within the 100 year flood plain. Ordinarily, an applicant who proposes to construct a principal structure in an area restricted against such a principal structure must apply to the Board of Adjustment for a "d" variance. Arguably, Spyco should have been required to follow the same procedure here as the Ordinance prohibits all buildings and structures in the overlay area.
On the other hand, there are convincing reasons as to why a variance from a flood plain ordinance should be handled by the Planning Board as a "c" variance. When the New Jersey Legislature enacted its Flood Hazard Area Control Act, N.J.S.A. 58:16A-50 et seq. it expressly empowered DEP to both adopt regulations pertaining to use of land within floodways and to make provisions for waivers where necessary to alleviate hardship. N.J.S.A. 58:16A-55. Criteria for hardship waivers are spelled out in the regulations, N.J.A.C. 7:13-2.9,[2] and in *545 many respects track the statutory subsection c(1) hardship variance criteria. N.J.S.A. 40:55D-70(c)(1); see also N.J.A.C. 7:13-4.2 (municipality may grant hardship waivers from its flood fringe area ordinances as defined and required by the Flood Control Hazard Act). Like the subsection c(1) hardship variance, DEP's hardship waiver focuses on the physical characteristics of the property which would cause enforcement of the restrictions to result in undue hardship and the uniqueness of the hardship to the particular individual applying for the waiver. DEP's hardship waiver regulations are not controlling here where the municipality has chosen to adopt a more restrictive Flood Hazard Ordinance than required by the State's Flood Hazard Control Act. A municipality may choose to condition variances on more restrictive criteria. However, given that Ocean Township's flood plain Zoning Ordinance does not contain its own conditions for a variance, we think that the DEP hardship waiver regulations are consistent with the recognition that unique physical conditions of the property and the unique impact on the owner are legitimate reasons (assuming that public and property safety are not impacted) for a planning board to grant a variance from a town's flood plain control ordinance in order to allow for a use otherwise permitted in the district.[3] Variances for hardship reasons are appropriately *546 granted under subsection c(1) and therefore, we conclude that a planning board did have the power, in the foregoing circumstances to grant a subsection (c)(1) hardship variance from a municipality's flood plain ordinance in order to allow a use otherwise permitted in that district.[4]
The trial judge concluded that the Board correctly found that there was no need for a variance and therefore, he did not reach the issue of whether if a variance was needed, it was properly granted. Rather than remanding the matter to the trial judge to consider whether a variance was properly granted in light of our decision that eight houses of the proposed subdivision are located within the 100 year flood plain as defined by the Ocean Township Ordinance, we will consider the issue here. Amico v. Bd. of Rev., Div. of Emp. Sec., 49 N.J. 159, 163 (1967).
A planning board's authority is limited to that granted by statute, Place v. Bd. of Adjust. of Saddle River, 42 N.J. 324, 331 (1964), and it must comply with the statutory criteria when granting a subsection c(1) variance.[5] Its power to grant a variance under this provision is limited to situations where one of the exceptional conditions of property exist and where strict application of the zoning ordinance will result in exceptional *547 and undue hardship upon the developer of the property. Additionally, it must be demonstrated that the statute's negative criteria are satisfied, that is the variance can be granted "without substantial detriment to the public good" and "it will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70; Commons v. Westwood Zoning Board of Adjustment, 81 N.J. 597, 604-605 (1980).
The standard of review by an appellate court is whether there was sufficient, competent evidence before the Planning Board to show that it was not arbitrary or unreasonable for it to find that the statutory criteria had been met. Shell Oil v. Zoning Bd. Adj. Shrewsbury, 127 N.J. Super. 60, 66 (App.Div. 1973), aff'd on dissent 64 N.J. 334 (1974). It has been said, however, that a court should give less deference to grant of a variance than to denial for "generally speaking more is to be feared from... ill-advised grants of variances than by refusals thereof ..." Beirn v. Morris, 14 N.J. 529, 536 (1954); Mahler v. Borough of Fair Lawn, 94 N.J. Super. 173, 186 (App.Div. 1967), aff'd 55 N.J. 1 (1969).
In support of its alternative decision that Spyco had presented adequate proofs to justify granting a variance, the Planning Board made detailed findings of fact. In this regard, the Planning Board concluded that the proposed plans "satisfactorily addressed any construction or drainage questions" and that "more storm water will be retained on the site over a longer period ... than is now retained on and released from this site in its present condition." Although we do not ignore the significance of these findings, they are directed almost exclusively at the negative criteria, that is that the grant of a variance will not result in substantial detriment to the public good. In addition to satisfying the negative criteria, an applicant for a hardship variance must show that his property is unique and different from other property in the zoning district and that this uniqueness places an exceptional hardship upon *548 the owner of the property if the zoning restrictions are applied. Irving Isko et als. v. Planning Bd. of Tp. of Livingston et als., 51 N.J. 162, 174 (1968). See also Chirichello v. Zoning Board of Adj., Monmouth Beach, 78 N.J. 544, 552 (1979). That the topography of land favors a given location does not warrant a hardship variance. Rather, topography of land must create practical difficulties for complying with an ordinance. Place v. Bd. of Adjust. of Saddle River, supra, 42 N.J. at 332. Moreover, "undue hardship" involves the underlying notion that no effective use can be made of a property in the event the variance is denied. Commons v. Westwood Zoning Board of Adjustment, 81 N.J. 597, 605 (1980). But see Davis Enterprises v. Karpf, 105 N.J. 476, 493 (1987) (J. Stein, concurring) (hardship may exist when extent to which property can be used is inhibited). Put another way, an owner is not entitled to have his property zoned for its most profitable use. Bow & Arrow Manor v. Town of West Orange, 63 N.J. 335, 350 (1973); Shell Oil v. Zoning Bd. Adj. of Borough of Shrewsbury, 64 N.J. 334 (1974).
Here the Planning Board did not make any findings of fact as to the peculiar or exceptional conditions which distinguish this property from other property within the designated 100 year flood plain. Nor have such distinguishing conditions been identified. Having failed to make these findings, the Board obviously could not make a finding as to how the exceptional conditions of the property imposed an undue hardship upon Spyco that would not be experienced by owners of other property within the designated flood plain. Accordingly, the Planning Board's alternative decision granting Spyco a hardship variance to construct residences within a flood plain as designated by the Township Zoning Ordinance cannot be sustained.
Arguments raised by Terner in Point IV are without merit. R.2:11-3(e)(1)(A), (D).
The dismissal of the complaint in lieu of prerogative writ is reversed, as is the determination of the Planning Board to the *549 extent inconsistent herewith. The matter is remanded to the Planning Board solely for modification of its approval to conform with this opinion.
NOTES
[1] Subsection c(1) provides:

Where: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to article 8 of this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property.
[2] Before DEP can grant a hardship waiver, the applicant must demonstrate the following:

1. That by reason of the extraordinary or exceptional situation or condition of the property, the strict enforcement of this subchapter would result in exceptional and undue hardship upon the applicant in question;
2. That the waiver will not substantially impair the appropriate use or development of adjacent property and will not pose a threat to the public health, safety, and general welfare;
3. That the hardship is unique or peculiar to the applicant; and
4. That the exceptional or undue hardship claimed as grounds for the waiver has not been created by the applicant. N.J.A.C. 7:13-2.9(d).
[3] In some cases a township does not use the "overlay" method but instead places its flood plain or wetland area into districts and specifies the permitted uses within those areas. See, e.g. Morris County Land, etc. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963) (township established special district for areas with high water table and permitted only such uses as agriculture, hunting, fishing, public utilities). The absence of any underlying permitted uses in the district would raise other questions about the suitability of granting a subsection c hardship variance which are not before the court in this case.
[4] We do not foreclose the possibility that "in particular cases and for special reasons," an applicant might properly apply to a board of adjustment for a subsection d variance from a town's flood plain ordinance. N.J.S.A. 40:55D-70(d). In this regard, we note that some flood plain zoning ordinances prohibit all structures except for necessary public and semipublic structures which are similar to the inherently beneficial uses that New Jersey courts have held satisfy the "special reasons" needed for a "d" variance. See Anderson, American Law of Zoning, § 30.56 (2d ed. 1977); Andrews v. Ocean Township Bd. of Adjustment, 30 N.J. 245 (1959). Additionally, our Supreme Court held in Medici v. BPR Co., 107 N.J. 1, 17, n. 9 (1987) that proof of undue hardship in the form of economic inutility can constitute special reasons for grant of a subsection d variance.
[5] The Planning Board in its memorializing resolution does not specify the type of variance it is granting. Spyco, however, in its brief refers to it as a subsection c(1) variance.